Bronson v. Burnham, 2026 NCBC 45.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV031560-910

JOHN S. BRONSON and PAUL G.
BRONSON, individually and
derivatively on behalf of
LAFAYETTE VILLAGE PUB, LLC
and EXECUTIVE SUITES AT
LAFAYETTE VILLAGE, LLC,

          Plaintiffs,

v.

KENNETH C. BURNHAM,

          Defendant,

and

LAFAYETTE VILLAGE PUB, LLC
and EXECUTIVE SUITES AT
LAFAYETTE VILLAGE, LLC,

          Nominal
          Defendants.

**ORDER AND OPINION ON
CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

**THIS MATTER** is before the Court on Plaintiffs John S. Bronson and Paul G.

Bronson's Motion for Summary Judgment (ECF No. 42) and Defendant Kenneth C.

Burnham's Motion for Summary Judgment (ECF No. 40) (together, "Motions for

Summary Judgment" or the "Motions").

The Court, having considered the Motions, the briefs and submissions of the

parties, the arguments of counsel, the applicable law, and all appropriate matters of

record, concludes that each of the Motions should be **DENIED in part** and

**DEFERRED in part** for the reasons set forth below.

> *Ragsdale Liggett PLLC, by William Pollock, Edward Coleman, Justin
> Egan, and Amie Sivon, for Plaintiffs John S. Bronson and Paul G.
> Bronson.*

*Equitas Law Partners, LLP, by Thomas Babel and Lieth Khatib, for Defendant Kenneth C. Burnham.*

*No counsel appeared for Nominal Defendants Lafayette Village Pub, LLC and Executive Suites at Lafayette Village, LLC.*

Davis, Judge.

## INTRODUCTION

1. This long-running dispute involves three members of a pair of related limited liability companies. After years of disagreements regarding the management of the companies, two of the members have asserted derivative claims for monetary relief against the third member and requested that both companies be judicially dissolved. In resolving the present Motions, the Court must determine which, if any, of the parties' claims require resolution by a jury at trial.

## FACTUAL AND PROCEDURAL BACKGROUND

2. "The Court does not make findings of fact on motions for summary judgment; rather, the Court summarizes material facts it considers to be uncontested." *McGuire v. LORD Corp.*, 2021 NCBC LEXIS 4, at *1–2 (N.C. Super. Ct. Jan. 19, 2021) (cleaned up).

3. Plaintiff John S. Bronson is a citizen of the State of California, and Plaintiff Paul G. Bronson is a citizen of the State of North Carolina (together, the "Bronsons"). (Amended Complaint, ECF No. 31, ¶¶ 4–5; Answer to Amended Complaint, ECF No. 35, ¶¶ 4–5; *see also* John Bronson Deposition Transcript, ECF No. 54.2, at 7; Paul Bronson Deposition Transcript, ECF No. 54.1, at 6.)

4. Defendant Kenneth C. Burnham is a citizen of the State of North Carolina. (Am. Compl. ¶ 6; Answer to Am. Compl. ¶ 6; Kenneth C. Burnham Deposition Transcript, ECF No. 55.1, at 8–9.)

5. The Bronsons and Burnham are each members of two separate limited liability companies—Lafayette Village Pub, LLC (the "Pub") and Executive Suites at Lafayette Village, LLC ("Executive Suites"). (Am. Compl. ¶¶ 45–46; Answer to Am. Compl. ¶¶ 45–46; ECF Nos. 39.5, 43.13, at 4; ECF No. 43.12, at 3–4.)

6. The Pub is a now-defunct North Carolina company, which previously maintained its principal place of business in Wake County, North Carolina. (Am. Compl. ¶ 1; Answer to Am. Compl. ¶ 1; *see also* ECF No. 37.1.)

7. At the time it was actively conducting business, the Pub leased space within the Lafayette Village Shopping Center (the "Shopping Center") in Raleigh, North Carolina, that it used to operate a restaurant (the "Restaurant"). (Am. Compl. ¶ 3; *see also* ECF No. 43.3, at 10.)

8. The Pub was formed by Burnham on 6 October 2010 through the filing of Articles of Organization with the North Carolina Secretary of State. (Am. Compl. ¶ 10; Answer to Am. Compl. ¶ 10.)

9. No operating agreement governing the management of the Pub has ever existed. (Am. Compl. ¶ 11; Answer to Am. Compl. ¶ 11.)

10. Since the time of (or shortly after) the Pub's formation, the Bronsons and Burnham have each been members of the Pub. (Am. Compl. ¶ 10; Answer to Am. Compl. ¶ 10.) However, the parties do not agree on the current value of each other's

ownership interests in the Pub or whether other persons continue to hold ownership interests as well.  (*Compare* ECF No. 49.5, at 2 (the Bronsons allege that they own 54.07% and Burnham owns 45.93%) *with* ECF No. 43.12 (Burnham alleges that he owns 51.84%, the Bronsons own 35.01%, and two non-parties own 13.15%).)

11.  Due to the lack of an operating agreement and the ensuing applicability of the default provisions of North Carolina's Limited Liability Company Act (the "LLC Act"), all of the Pub's members also served as its managers.

12.  Over time, the Bronsons and Burnham began having disagreements regarding how the Pub was being managed, its finances, and the Bronsons' entitlement to access the company's accounts and records.  (John Bronson Dep. Tr., at 16; ECF No. 43.6, at 1–2.)

13.  As discussed more fully throughout this Opinion, the Bronsons contend that Burnham has not only usurped their managerial rights—by running the company unilaterally without any regard for their input—but has also misappropriated company assets and engaged in conflict-of-interest transactions to the detriment of the Pub.  (Am. Compl. ¶¶ 27–36; *see also* John Bronson Dep. Tr., at 15.)

14.  In November 2024, the Pub was notified by the Shopping Center that its lease for the Restaurant would not be renewed due to the Pub's failure to continue paying rent.  (ECF No. 39.2, at 1, 6.)  As such, the Restaurant ceased operations in December 2024.  (ECF No. 38.4, at 1.)

15.     Several months later, an office administrator for one of Burnham's separately owned businesses—KDM Development, Inc.—used her access to Burnham's electronic signature to execute and file Articles of Dissolution for the Pub with the North Carolina Secretary of State.  (ECF No. 38.4, at 1–2.)[1]

16.     As a result, the Pub was administratively dissolved by the North Carolina Secretary of State on 8 May 2025.  (ECF No. 37.1.)  As of the present date, no actions have been taken by Burnham or the Bronsons to restore the Pub's status as an active company.

17.     The other entity at issue in this case is Executive Suites, a North Carolina limited liability company that maintains its principal place of business in Wake County, North Carolina.  (Am. Compl. ¶ 2; Answer to Am. Compl. ¶ 2.)

18.     Executive Suites leases space at the Shopping Center, which it uses to sub-lease furnished office spaces and shared business amenities to third parties.  (Am. Compl. ¶ 40; Answer to Am. Compl. ¶ 40.)

19.     Burnham organized Executive Suites by filing its Articles of Organization with the North Carolina Secretary of State on 16 June 2008.  (Am. Compl. ¶ 39; Answer to Am. Compl. ¶ 39.)

---

[1] Burnham testified that this act by his office administrator was mistakenly taken on her own initiative (rather than pursuant to his instructions) after a conversation between them in which he mentioned that the Restaurant would no longer be operating.  (ECF No. 39.2, at 2; *see also* ECF No. 38.4, at 1.)

20.     The Bronsons and Burnham are the sole members of Executive Suites, with each of the Bronsons owning a 25% interest and Burnham owning a 50% interest.  (Am. Compl. ¶¶ 45–46; Answer to Am. Compl. ¶¶ 45–46.)

21.     Executive Suites has also never had an operating agreement, and the default provisions of the LLC Act therefore apply.  (ECF No. 57, at 1.)  As a result, each of the three parties to this action serve as managers of Executive Suites.

22.     As with the Pub, the Bronsons contend that Burnham has managed Executive Suites as if he exercised complete control over the company to the exclusion of any input from them.  (Am. Compl. ¶¶ 47–58; *see also* John Bronson Dep. Tr., at 15.)

23.     In this lawsuit, the Bronsons contend that Burnham has improperly caused Executive Suites to make large payments directly to himself as well as to companies in which he has a separate ownership interest.  (Am. Compl. ¶ 54; *see generally* ECF No. 43.17.)[2]

24.     The Bronsons first filed a lawsuit against Burnham in Wake County Superior Court (the "Prior Action") on 21 April 2022, asserting various claims against him with regard to the operation of the Pub.  *See Lafayette Vill. Pub, LLC v. Burnham*, 2022 NCBC LEXIS 104 (N.C. Super. Ct. Sept. 12, 2022).  The Bronsons subsequently took a voluntary dismissal without prejudice of the Prior Action.

---

[2] The Bronsons' contentions (and the evidence supporting them) with regard to Executive Suites are also discussed more fully below.

25.     The Bronsons initiated the present action on 2 October 2024 by filing a new Complaint against Burnham (ECF No. 3) in Wake County Superior Court.

26.     In the Complaint, the Bronsons asserted a combination of individual (or direct) and derivative claims (on behalf of both the Pub and Executive Suites) against Burnham.

27.     This matter was designated as a mandatory complex business case on 25 October 2024 and assigned to the undersigned on 28 October 2024.  (ECF Nos. 1–2.)

28.     On 4 March 2025, the Court dismissed the Bronsons' individual claims for breach of fiduciary duty and constructive fraud with prejudice pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.  *See Lafayette Vill. Pub, LLC v. Burnham*, 2025 NCBC LEXIS 23 (N.C. Super. Ct. Mar. 4, 2025).

29.     The Bronsons subsequently filed an Amended Complaint (ECF No. 31)—which is currently their operative pleading—on 30 May 2025.  In the Amended Complaint, the Bronsons have asserted the following claims: (1) derivative claims for breach of fiduciary duty and constructive fraud on behalf of the Pub; (2) derivative claims for breach of fiduciary duty and constructive fraud on behalf of Executive Suites; (3) claims seeking judicial dissolution of the Pub and Executive Suites; and (4) claims for declaratory relief—requesting that the Court enter an order prohibiting Burnham from acting on behalf of both the Pub and Executive Suites.

30.     Burnham filed his Motion for Summary Judgment on 31 December 2025, requesting that the Court enter judgment in his favor with respect to each of

the Bronsons' derivative claims for monetary damages and their claims for judicial dissolution.

31. The Bronsons filed their Motion for Summary Judgment on 2 January 2026, wherein they request that the Court enter judgment in their favor as to those same claims.

32. The Motions came on for a hearing before the Court on 11 March 2026 at which the Bronsons and Burnham were each represented by counsel.

33. Having been fully briefed, the Motions are now ripe for resolution.

**LEGAL STANDARD**

34. It is well established that "[s]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (quoting N.C. R. Civ. P. 56(c)). "[A] genuine issue is one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (cleaned up).

35. On a motion for summary judgment, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.'" *McCutchen v. McCutchen*, 360 N.C. 280, 286 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470

(2004)). "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

36. The party moving for summary judgment may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense . . . or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000). "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e)). If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558 (2017) (quoting N.C. R. Civ. P. 56(e)).

37. When a party requests offensive summary judgment on its own claims for relief, "a greater burden must be met." *Brooks v. Mt. Airy Rainbow Farms Ctr., Inc.*, 48 N.C. App. 726, 728 (1980). The moving party "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985). For that reason, it is "rarely . . . proper to enter summary

judgment in favor of the party having the burden of proof." *Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984).

## ANALYSIS

38.     In their respective Motions for Summary Judgment, the Bronsons and Burnham each request that the Court enter judgment in their favor with respect to (1) the Bronsons' derivative claims for breach of fiduciary duty asserted on behalf of both the Pub and Executive Suites; (2) the Bronsons' derivative claims for constructive fraud asserted on behalf of both companies; and (3) the Bronsons' claims for judicial dissolution of both companies.[3]  Because of the substantial overlap of the respective Motions—and the arguments made in support thereof—the Court deems it appropriate to analyze the Motions together.

39.     Before analyzing the parties' specific arguments in support of their Motions, the Court finds it helpful to address two issues at the outset.

40.     First, it is important to emphasize that the only remaining claims for monetary relief in this case are *derivative* claims brought on behalf of the Pub and Executive Suites.  *See Raymond James Cap. Partners, L.P. v. Hayes*, 248 N.C. App. 574, 577 (2016) (noting that "[a] derivative proceeding is a civil action brought . . . in the right of a corporation" and seeks to recover for "injury suffered by the corporate entity as a whole" (cleaned up)).  As noted above, the Court previously dismissed the

---

[3] Neither side has sought summary judgment with respect to the Bronsons' claims for declaratory relief.

Bronsons' *individual* claims for monetary relief against Burnham. *See Lafayette Vill. Pub, LLC*, 2025 NCBC LEXIS 23, at *23.

41. Second, it is helpful to note certain aspects of the LLC Act that are applicable to the management of the two companies at issue.

42. As stated above, both the Pub and Executive Suites are limited liability companies organized under North Carolina law, and the parties agree that neither company is governed by an operating agreement.[4]

43. As a result, the default provisions of the LLC Act govern the management of the companies. *See Friedmann v. Griffin*, 2025 NCBC LEXIS 70, at *9 (N.C. Super. Ct. June 16, 2025) (concluding that "where, . . , limited liability companies lack operating agreements, the default provisions set out in Chapter 57D of the North Carolina General Statutes (as supplemented by North Carolina common law) are applicable"); *see also Crouse v. Mineo*, 189 N.C. App. 232, 237 (2008) ("In the present case, the parties agree that they never entered into a written operating agreement. Therefore, the default provisions of the LLC [A]ct govern the present case.").

44. Specifically, N.C.G.S. § 57D-3-20 states in relevant part as follows:

(a) The management of an LLC and its business is vested in the managers.

(b) Each manager has equal rights to participate in the management of the LLC and its business. Management decisions approved by

---

[4] Following the 11 March hearing on the Motions, the parties filed a Joint Statement of Stipulated Facts (ECF No. 57) on 25 March 2026, which resolved any uncertainty as to whether a document produced in discovery served as an operating agreement for Executive Suites.

a majority of the managers are controlling. The managers may make management decisions without a meeting and without notice.

(c) Subject to the direction and control of a majority of the managers as provided in N.C.G.S. § 57D-3-20(b), each manager may act on behalf of the LLC in the ordinary course of the LLC's business.

(d) All members by virtue of their status as members are managers of the LLC, together with any other person or persons who may be designated as a manager in, or in the manner provided in, the operating agreement. . . .

(e) A person shall continue to serve as a manager until the earliest of the following occurs: (i) the person's resignation as a manager; (ii) any event described in N.C.G.S. § 57D-3-02(a) with respect to the person, substituting therein the term "manager" in lieu of the term "member" for purposes of this subsection; or (iii) that person, or the member or all of a class or group of less than all of the members who appointed the person to be a manager, ceases to be a member.

N.C.G.S. § 57D-3-20.

45. As a result, John Bronson, Paul Bronson, and Burnham—as members—have, at all relevant times, each served as managers of the two companies.

46. Against this backdrop, the Court will now address the parties' arguments.

## I. Claims Relating to the Pub

47. With respect to the Pub, both the Bronsons and Burnham have sought summary judgment in their favor on: (1) the Bronsons' derivative claim for breach of fiduciary duty; (2) the Bronsons' derivative claim for constructive fraud; and (3) the Bronsons' individual claim for judicial dissolution.

48. However, for the following reasons, the Court concludes that (1) genuine issues of material fact exist that preclude the entry of summary judgment for either

side on the claims for monetary relief; and (2) the resolution of the dissolution claim at the present time would be premature.

### A. Breach of Fiduciary Duty

49. It is well-settled that "[t]o establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of the injury to the plaintiff." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019) (cleaned up). Thus, in order "to make out a claim for breach of a fiduciary duty, plaintiff[ ] must first allege facts that, taken as true, demonstrate that a fiduciary relationship existed between the parties." *Id.* at 339–40. Once the plaintiff has established "a *prima facie* case of the existence of a fiduciary duty, and its breach, the burden shifts to the defendant to prove he acted in an open, fair, and honest manner, so that no breach of fiduciary duty occurred." *Collier v. Bryant*, 216 N.C. App. 419, 432 (2011) (cleaned up).

50. Here, there is no dispute that Burnham—as a manager of the Pub— owed a fiduciary duty to the Pub "to discharge [his] duties in good faith, with the care of an ordinary prudent person, and in the best interests of the LLC." *Trail Creek Invs. LLC v. Warren Oil Holding Co., LLC*, 2023 NCBC LEXIS 70, at *29 (N.C. Super. Ct. May 9, 2023) (cleaned up); *see also Cranford v. Hintz*, 2026 NCBC LEXIS 88, at *21 (N.C. Super. Ct. Apr. 15, 2026) (noting that "managers generally owe fiduciary duties to the company as a whole under N.C.G.S. § 57D-3-21" (cleaned up)).

51.     The primary point of contention in the parties' respective arguments concerns the sufficiency of the evidence offered by the Bronsons relating to Burnham's alleged breaches of his fiduciary duty.

52.     In the Amended Complaint, the Bronsons specifically identify eighteen separate actions by Burnham as forming the basis of their derivative breach of fiduciary duty claim on behalf of the Pub.  (*See* Am. Compl. ¶¶ 32(a)–(r).)  Broadly, each of those alleged acts can be categorized as allegations that Burnham (1) wrongfully engaged in various self-interested transactions; (2) misappropriated the Pub's property; (3) failed to keep adequate financial records for the Pub; and (4) ignored the Bronsons' instructions relating to the Pub's management.

53.     The fourth category is not directly relevant to the Bronsons' derivative claims for monetary damages because it concerns the alleged usurpation of their own managerial rights rather than any injury to the Pub itself.  Therefore, the Court will confine its analysis to the first three categories of alleged misconduct.

## Engaging in Self-Dealing

54.     First, the Bronsons assert that Burnham breached his fiduciary duty to the Pub by engaging in a series of self-interested transactions.

55.     It is well established under North Carolina law that the duty of good faith requires managers of a limited liability company to avoid self-dealing.  *See Norment v. Rabon*, 2022 NCBC LEXIS 86, at *18 (N.C. Super. Ct. July 7, 2022) ("The LLC Act further provides that managers of an LLC shall discharge their duties in

good faith. The duty of good faith prohibits acts that constitute self-dealing." (cleaned up)).

56. In support of this theory, the Bronsons argue that the record contains evidence of various potential conflict-of-interest transactions by Burnham as to which he failed to seek approval from the Pub's other disinterested managers.

57. Among other assertions, the Bronsons contend that Burnham has unilaterally entered into loan agreements between himself and the Pub. His self-interested transactions, the Bronsons contend, are reflected in: (1) a promissory note issued to Burnham by the Pub for "[up] to $600,000 on a rolling basis" (ECF No. 48.5, at 1–4; ECF No. 49.2); (2) the Pub's 31 December 2021 balance sheet, which reflects liability for a $104,889.93 loan from Burnham (ECF No. 48.4, at 12); (3) the Pub's 23 September 2022 balance sheet, which reflects liability for a $50,000 loan from Burnham (ECF No. 48.4, at 15); and (4) the Pub's general ledger, which reflects monthly payments of $2,269.96 to Burnham as purported loan repayments (ECF No. 48.5, at 6).

58. In his deposition, Burnham acknowledged the existence of loans between himself and the Pub.

Q: And I believe you testified you spent approximately a million dollars on the renovation?

A: Approximately. Could be more or less.

Q: Where did that money come from?

A: It was a loan that basically came from myself and the ERC money. That's pretty much it.

Q:   And what are the -- is the loan from you reflected in a promissory note?

A:   Yeah.

. . .

Q:   And I see this is dated June 1 of 2022, is that correct?

A:   Yeah.

Q:   There was [*sic*] no notes owed to you prior to this, is that correct?

A:   No.

Q:   How about your wife?  Did she have a note owed to her at any time?

A:   By "no," I meant there were.

Q:   Oh, there were?

A:   Yes.

Q:   What happened?  Were those produced in discovery?

A:   The ones that have been on the books for a long time.  It's for the equipment from the original -- from 2010.  I think that one is almost paid off.

Q:   How much were the payments being made on that note?

A:   I think four thousand, six hundred or something.

. . .

Q:   And then it looks like this time we have a loan from you of fifty thousand, and one from your wife of eighty-six thousand.  Is that correct?

A:   That's what it says.

. . .

Q:   I see a very substantial indebtedness to C. Burnham.  That's Cathleen, is that correct?

A:   That's correct.

Q:   Did she contribute a large portion of the capital used to build out the Pub initially?

A:   Initially she paid for the equipment. There was an equipment loan that's still being paid on. I think the balance of that is a hundred and eight thousand, I think I saw.

Q:   Is she -- is she still receiving payments on that loan?

A:   No. I am, because it's been assigned to me.

(Kenneth Burnham Dep. Tr., at 65–67, 79, 82.)

59.   Moreover, his testimony did not refute the Bronsons' assertions that (1) the loans were made without prior approval from the Pub's other managers; and (2) the terms of the loans were determined by Burnham alone.

60.   In addition, the Bronsons contend that Burnham has also engaged in other self-interested transactions by having the Pub make payments to another of his companies—Value Manufactured Homes. Specifically, the Bronsons point to the 23 September 2022 balance sheet for the Pub, which reflects a $241,000 liability to Value Manufactured Homes. (*See* ECF No. 48.4, at 14.)

61.   In his deposition, Burnham was unable to explain with specificity any of the transactions between the Pub and Value Manufactured Homes.

Q:   Does [the Pub] owe money to Value Manufactured Homes?

A:   I think they do. Yeah.

. . .

Q:   And there's the first -- and we see there, you know, a payable to Value Homes, right? That's the company we -- your company we've talked about, correct?

A:   Yeah. I don't know if that's a correct entry or not.

Q:     You don't think -- it's possible the Pub doesn't owe Value Homes two hundred and fourteen -- two hundred and forty-one thousand dollars?

A:     Yeah.  I'm going to have to look into that.

. . .

Q:     Also on that page do you see where there's a long-term liability of Value Homes?

A:     Twenty thousand dollars?

Q:     Yes.  Do you know why that -- why Value Homes is owed twenty thousand dollars in 2013?

A:     No.  My -- my memory doesn't go back that far.

(Kenneth Burnham Dep. Tr., at 63–64, 78–79, 82.)

62.     To be sure, the record is not a model of clarity as to exactly what transpired in connection with the above-referenced transactions.  However, the evidence of record is sufficient for the Court to conclude that there are genuine issues of material fact as to whether these acts amounted to a breach of Burnham's fiduciary duties to the Pub.  *See Potts v. KEL, LLC*, 2019 NCBC LEXIS 30, at *15 (N.C. Super. Ct. May 9, 2019) (denying summary judgment where the officer/shareholder defendant "channeled more than $150,000 to himself without board approval" and there was no evidence that those transactions "were fair to [the company]"); *Brady v. Prince*, 2015 NCBC LEXIS 5, at *27 (N.C. Super. Ct. Jan. 7, 2015) (finding sufficient evidence of breach of fiduciary duty where the defendants "wrote checks to [themselves] for $50,000 out of the corporate banking account" and "[t]here [were] no corporate resolutions, loan documents[,] or any other evidence that would establish that the payments were authorized" or were "for any proper corporate purpose").

## Misappropriating the Pub's Property

63. Second, the Bronsons assert that Burnham breached his fiduciary duty to the Pub by misappropriating its property for his own personal use. Specifically, the Bronsons contend that Burnham unilaterally caused a piano, televisions, furniture, and artwork to be moved from the Restuarant (at the Pub's expense) to his personal residence in connection with a renovation of the Restaurant.

64. In January 2022, Burnham retained a consulting firm, JCG3 Development, to "assess the operations, management, and brand" of the Restaurant. (*See generally* ECF No. 48.2.) In its report, JCG3 Development opined that the Restaurant was "suffering from a lack of experienced management" and that its brand was "tired, dated, and [was] getting passed by." (ECF No. 48.2, at 3, 6.)

65. Shortly after receiving JCG3 Development's report, Burnham emailed the Bronsons on 23 February 2022 to inform them that he was "in the planning stages of doing a full renovation" of the Restaurant and that he planned for the budget to be between $150,000 and $250,000. (ECF No. 49.11; Kenneth Burnham Dep. Tr., at 65.) Although the Bronsons objected to the need for the renovations and made their feelings known by means of a letter to Burnham from their attorney (ECF No. 49.13), Burnham nevertheless continued with his plans to renovate the Restaurant, which resulted in the Restaurant being closed for four months between January 2023 and April 2023. (Kenneth Burnham Dep. Tr., at 49, 72, 75; *see also* John Bronson Dep. Tr., at 36–37.)

66.     As part of the remodeling process, Burnham arranged for the Pub to pay for the removal of various pieces of furniture, televisions, and artwork from the Restaurant. (Kenneth Burnham Dep. Tr., at 51–52.) Burnham directed that these items either be taken to his personal residence or thrown away. (Kenneth Burnham Dep. Tr., at 49–52; John Bronson Dep. Tr., at 44, 46; Paul Bronson Dep. Tr., at 99–100.)

67.     The renovations were completed, and the Restaurant reopened, in May 2023. (Kenneth Burnham Dep. Tr., at 49.) The final cost of the renovation far exceeded Burnham's initial projected budget, ultimately costing the Pub approximately $1 million. (Kenneth Burnham Dep. Tr., at 48, 65.)

68.     The furniture, televisions, and artwork that had been moved to Burnham's personal residence during the renovation were not returned to the Pub. (Kenneth Burnham Dep. Tr., at 49–52; John Bronson Dep. Tr., at 44, 46; Paul Bronson Dep. Tr., at 99–100.)

69.     With respect to this conduct, the Bronsons and Burnham offered the following conflicting deposition testimony:

Q:      . . . But sitting here today, you don't know whether he has used any of those funds that you're concerned about for non-business purposes, correct?

A:      . . . So we know, for instance, that [Burnham] does things like -- we had a piano at [the Pub]. [Burnham] shipped it to his house in Pittsford. Never paid for it. It was a twenty-five-thousand-dollar ($25,000) piano. It cost us about four thousand dollars ($4,000) to ship it. And he never consulted us on that. He just shipped it to his house.

And in the renovations, there -- some of the contractor details say that we're taking things, televisions -- so we paid to have people

take televisions out and deliver them to [Burnham's] house. So they used to belong to us. Now they belong to [Burnham], I guess. So yeah. We have -- we have a real belief that -- we know that he did that. We know that he shipped the piano to himself. . . .

. . .

Q:    Okay. All right. Now let's -- I was going to -- you got ahead of me, and we'll talk about the piano. So this piano -- the piano was bought with company funds?

A:    Correct.

Q:    Okay. And sitting here today, that piano is not back in the [Pub]?

A:    That's correct.

Q:    Okay. And do you know whether [ ] Burnham has reimbursed the entity for the value of that piano?

A:    I do not.

Q:    Okay. And then you reference[d] some TVs. What's the -- what's these [*sic*] TVs you were referring to?

A:    There were televisions in [the Pub]. They were removed as part of the remodel. They were sent to [Burnham's] house.

. . .

Q:    Do you know if the TVs were returned to the [Pub]?

A:    I know they were not.

Q:    Okay. Do you know whether [ ] Burnham has reimbursed the [Pub] for the value of those TVs?

A:    I do not know that.

(John Bronson Dep. Tr., at 43–44, 46–47.)

Q:    . . . Have you told anyone other than your brother [ ] Burnham has stolen or taken property of the [ ] Pub?

A:    I believe so. The piano was the first thing.

Q:    Okay. Who did you tell?

A: I can't remember. . . .

. . .

Q: Okay. I mean, so are these employees of the [ ] Pub? Customers of the [ ] Pub?

A: I can't -- we had a piano that was -- that they -- [Gebauer] and [Burnham] decided would be great to have a piano player in there, so they bought a piano, you know, for the [Restaurant], had it in there. It was a fairly expensive one. I asked [Gebauer] what it cost. He said it was like twenty-five grand. And then very early in the innings [*sic*], probably the first three months we had it, we didn't have a piano player, nobody used it. It was sitting up there catching dust, and it wasn't an expenditure we needed, and it was in the way. And I'm saying, you know, "This isn't a piano bar; this is a sports bar. What were you guys thinking about?" [Burnham] said, "Well, I'll have it shipped up to my house. We can use one."

So he had actually used my secretary, Debbie. He said, "Make arrangements and ship it up here." And when they couldn't ship it to his house. They had to move it or something. So he had her -- had it shipped up to his own house. Didn't ask his partners or say, "Let me pay for it." He took it.

(Paul Bronson Dep. Tr., at 98–100.)

Q: And what happened to all of the furniture that had been in the [Pub]?

A: Everything in there was junk, so --

Q: Threw it away?

A: Threw it away or, you know, tried to sell it on craigslist or whatever. But a lot of it we couldn't get any money for, so --

Q: What about the televisions? Do you have TVs in there now?

A: I have three new TVs in there now.

. . .

Q: And what happened to the old TVs?

A:     Initially, they were taken to my garage.  And we tried to sell them on craigslist, or one of the other sites, but no one was interested, even at a dollar.  So --

Q:     So what did you do with them?

A:     Some of them are still in my garage.  Some of them, I threw -- I took to the, you know, the junkyard.  . . .

Q:     And what happened to the piano that used to be in the [Restaurant]?

A:     A long time ago, we needed that space, so I took it to my house in Raleigh.

Q:     And did you ever pay the Pub for it?

A:     Yes, I did.

Q:     How much?

A:     I can't remember.  It was a long time ago.

. . .

Q:     I'm handing you what's been marked as Exhibit 43.  Can you identify that document?

A:     Appears to be an invoice to the -- to the Pub.

Q:     Where you paid twenty-seven hundred and five dollars to move the TVs to your house, correct?

A:     Furniture.  TVs and furniture, yeah.  Furniture went into the basement.

. . .

Q:     There was some art that was taken down as well?

A:     Yes.  Some of that was sold.

Q:     Okay.  How was it sold?

A:     There was a silent auction, and some of it was sold at the silent auction.  And then I still have some in my garage.

(Kenneth Burnham Dep. Tr., at 49–52.)

70.     Based on this testimony, the Court concludes that there is a genuine issue of material fact as to whether Burnham acted in violation of his fiduciary duty to the Pub by moving the piano, televisions, furniture, and artwork to his personal residence and whether he fully reimbursed the Pub for the fair value of this property. *See Norment*, 2022 NCBC LEXIS 73, at *33 (denying summary judgment on a breach of fiduciary duty claim where there was a genuine dispute of material fact as to whether defendants "intentionally refused to return assets that belonged to [plaintiff]"); *see also Clark v. B.H. Holland Co.*, 852 F. Supp. 1268, 1275 (E.D.N.C. 1994) (finding that whether "[d]efendants conducted the business of the [company] in bad faith for the purpose of benefitting themselves" or whether "their actions were taken in good faith in order to further the interests of the [companies] . . . depend[ed] upon [the] credibility of witnesses and [was] therefore not amenable to resolution on summary judgment").

**Failing to Keep Records**

71.     Third, the Bronsons argue that Burnham breached his fiduciary duties to the Pub by failing to keep adequate records of key financial transactions. Specifically, the Bronsons contend that Burnham (1) authorized various transactions on behalf of the Pub without being able to explain what they were for; (2) could not identify the signatory on various checks written by the Pub; and (3) received $322,798 in Paycheck Protection Program loans without documenting how the loaned funds were used.

72. In support of this theory, the Bronsons have primarily cited to various portions of Burnham's deposition, in which he was unable to provide details regarding how the Pub's resources were used. (*See* Kenneth Burnham Dep. Tr., at 45–47 (testifying that he "d[idn't] know" who had signing authority for the Pub's bank accounts); at 51 (admitting that he "really d[idn't] know" whether certain payments would be reflected in the Pub's balance sheet); at 52 (stating that he "d[idn't] know what happened" to the Pub's furniture after the renovation); at 55 (agreeing that he "d[idn't] know what the [Paycheck Protection Program] money was spent" on); at 57–58 (testifying that he "d[idn't] know why" the Pub's bank records reflected regular transactions with Value Manufactured Homes); at 59 (admitting that he "d[id] not" know what transfers in the amounts of $20,000, $9,000, and $12,000 were for); at 74–75 (stating that he "d[idn't] know" whether the Pub spent $54,000 for repairs and maintenance during the first six months of 2023); at 79 (representing that he "d[idn't] know if" the Pub's balance sheet was correct)).

73. The Bronsons have also detailed various expenditures by the Pub that they contend have no supporting documentation. (*See* ECF Nos. 39.5, 43.13, at 10 (representing that no documentation has been provided with respect to: (1) transactions totaling $39,000 to JCG3 Development between January 2022 and February 2023; (2) payments in excess of $10,000 to Warehouse Interiors (Meritta Interiors) in 2022; (3) expenses exceeding $14,000 relating to Robles Construction in 2022; and (4) various payments to Cary Restaurant Supply)).

74.     Based on the totality of the evidence of record, the Court believes that the Bronsons have presented sufficient evidence to create a genuine issue of material fact regarding whether Burnham's failure to maintain adequate financial records for the Pub was inconsistent with his fiduciary obligations. *See, e.g.*, *Bandy v. A Perfect Fit for You, Inc.*, 2018 NCBC LEXIS 21, at *14 (N.C. Super. Ct. Mar. 7, 2018) (concluding that a director's "fail[ure] to make certain [the company's] claims were properly documented" could be found to be a breach of fiduciary duty).

75.     Burnham nevertheless contends that he is entitled to summary judgment on this claim because (1) the acts at issue can be properly characterized as management decisions that are encompassed by the business judgment rule; and (2) the Pub has not suffered any damages from these acts.

76.     The Court will address each of these arguments in turn.

### Business Judgment Rule

77.     Burnham first asserts that he cannot be held liable for conduct relating to his management of the Pub because the acts of which the Bronsons complain are based on decisions for which he is immunized from liability by the business judgment rule.

78.     The business judgment rule protects company officials from individual liability relating to "(1) an advertent business decision (2) made by disinterested directors (3) within the scope of their authority (4) in good faith (5) with reasonable care and (6) not for their own self-interests." *Lee v. McDowell*, 2022 NCBC LEXIS 51, at *34 (N.C. Super. Ct. May 26, 2022) (cleaned up).

79.     This Court has previously held that

> [i]n North Carolina, the business judgment rule creates, first, an evidentiary presumption that in making a decision, the managers acted on an informed basis and in good faith in the honest belief that their decision was in the best interest of the LLC, and second, absent rebuttal of the initial presumption, the rule creates a powerful substantive presumption that a decision by a loyal and informed manager will not be overturned by a court unless it cannot be attributed to any rational business purpose.

*Emrich Enters., LLC v. Hornwood, Inc.*, 2022 NCBC LEXIS 19, at \*45 (N.C. Super. Ct. Feb. 15, 2022) (cleaned up); *see also* N.C.G.S. § 57D-3-21(c) (stating that a manager cannot be held "liable to the LLC for any act or omission as a manager if the manager act[ed] in compliance" with their statutory duties).

80.     However, it is well recognized that the "protection afforded by the business judgment rule is not unlimited[.]" *Blythe v. Bell*, 2013 NCBC LEXIS 7, at \*38 (N.C. Super. Ct. Feb. 4, 2013) (cleaned up).  A plaintiff may overcome the business judgment rule with proof that the manager "failed to act (1) in good faith, (2) in the honest belief that the action taken was in the best interest of the company[,] or (3) on an informed basis." *Cone v. Blue Gem, Inc.*, 2023 NCBC LEXIS 127, at \*19 n.6 (N.C. Super. Ct. Oct. 13, 2023) (cleaned up).

81.     Having thoroughly reviewed all of the evidence of record, the Court concludes that Burnham is not entitled to summary judgment on the Bronsons' breach of fiduciary duty claim in its entirety based on the application of the business judgment rule.

82.     Although some of the Bronsons' many grievances against Burnham may be encompassed—on their face—by the business judgment rule, others are not.

Taking the evidence in the light most favorable to the Bronsons, a jury could reasonably find that a number of the transactions that form the bases for the breach of fiduciary duty claim involved an inherent conflict of interest in which Burnham stood on both sides of the transaction. *See Geitner v. Mullins*, 182 N.C. App. 585, 592 (2007) ("A conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect interest." (cleaned up)).

83. As discussed above, the record includes evidence suggesting, among other things, that Burnham engaged in loan transactions with the Pub under terms that he unilaterally decided upon without seeking approval from the other managers and that he used company funds to move property belonging to the Pub to his personal residence (where it apparently remains). Moreover, in his deposition, Burnham repeatedly admitted his inability to recall key details regarding certain specific transactions that form the bases of the Bronsons' claims.

84. Because it is well settled that the evidentiary presumption of validity afforded by the business judgment rule does not apply to conflicted transactions or self-dealing, Burnham is not entitled to summary judgment on this basis. *See Vill. at Motts Landing Homeowners' Ass'n v. Aftew Props., LLC*, 2023 NCBC LEXIS 100, at *9 (N.C. Super. Ct. Aug. 14, 2023) ("[T]he Sobols' actions were self-interested—not disinterested—and therefore not shielded by the business judgment rule."); *Emrich Enters., LLC*, 2022 NCBC LEXIS 19, at *54 n.8 ("In selling its fabric to [the company], [defendant] was engaged in a self-interested transaction. While it may be appropriate for a fiduciary to negotiate in his own interest, it does not follow that he is entitled to

the business judgment rule when doing so." (cleaned up)); *Lee*, 2022 NCBC LEXIS 51, at *32 (declining to apply the business judgment rule at summary judgment where there was a dispute of material fact as to whether the directors "engaged in a rational [decision-making] process" or "unreasonably permitted the waste of [the company's] corporate assets"); *Norment*, 2022 NCBC LEXIS 73, at *33 (concluding that "clearly material factual disputes render[ed] summary judgment inappropriate on the basis of the business judgment rule" based on disputed evidence indicating that the defendants "engaged in self-dealing by improperly making substantial payments from company assets to themselves"); *see also Kixsports, LLC v. Munn*, 2021 NCBC LEXIS 32, at *18 (N.C. Super. Ct. Apr. 1, 2021) (concluding that "[a] jury must decide . . . whether [defendant] acted in good faith and in the best interests of the company").

## Lack of Damages

85. Burnham next argues that the Bronsons are unable to show that the Pub suffered actual injury as a proximate result of Burnham's acts. This argument fails for two reasons.

86. First, although the record is presently unclear as to the precise amount of any damages suffered by the Pub, such precision is not required on a breach of fiduciary duty claim at the summary judgment stage. *See BDM Invs. v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at *32 (N.C. Super. Ct. Mar. 20, 2014) (finding a genuine issue of material fact as to whether the plaintiff suffered actual damages where "[t]he court ha[d] already concluded that issues of material fact exist[ed] regarding whether [defendant] breached his fiduciary" duty to the company).

87.    Second, our Supreme Court has addressed a similar argument concerning the "injury" element of a claim for breach of fiduciary duty and stated as follows:

> Although this Court has not previously addressed the issue of whether a plaintiff is required to prove actual damages in support of breach of fiduciary duty and constructive fraud claims, the Court of Appeals has addressed this issue on a number of occasions. . . .
>
> . . .
>
> As a result of our belief that the Court of Appeals decisions discussed above were correctly decided, we adopt the reasoning of the Court of Appeals and hold that potential liability for nominal damages is sufficient to establish the validity of claims for breach of fiduciary duty and constructive fraud and can support an award of punitive damages. Aside from the fact that nothing in the prior decisions of this Court indicates that proof of actual injury is necessary in order to support a claim for breach of fiduciary duty or constructive fraud, we see no basis for treating the incurrence of nominal damages as a second-class legal citizen in this context, particularly given that such damages do reflect the existence of a legal harm and the fact that the policy of North Carolina law is to discourage breaches of fiduciary duty and acts of constructive fraud.

*Chisum v. Campagna*, 376 N.C. 680, 703, 705 (2021) (cleaned up).

88.    Because the Pub would be entitled, at a minimum, to an award of nominal damages if a jury concludes that Burnham breached his fiduciary duty, summary judgment on this basis is likewise improper. *See MOHR Partners, Inc. v. Elior, Inc.*, 2025 NCBC LEXIS 59, at *54 (N.C. Super. Ct. May 21, 2025) (denying summary judgment where the plaintiff "failed to show actual damages" because the plaintiff "[would] be entitled to recover nominal damages on its breach of fiduciary duty counterclaim at trial if it prevail[ed] on that claim" (cleaned up)); *Hart v. First Oak Wealth Mgmt., LLC*, 2025 NCBC LEXIS 27, at *73–74 (N.C. Super. Ct. Mar. 14,

2025) (denying summary judgment where the company "did not suffer actual damages as a result of [defendants'] conduct" because "nominal damages are available once a cause of action . . . has been established" (cleaned up)); *Kixsports*, 2021 NCBC LEXIS 32, at *41 (rejecting the argument that the plaintiffs "ha[d] not shown evidence of actual damages" because "the absence of evidence of actual damages does not" entitle a defendant to summary judgment on a breach of fiduciary duty claim); *see also Loyd v. Griffin*, 2021 NCBC LEXIS 72, at *11 n.6 (N.C. Super. Ct. Sept. 1, 2021) ("[E]ven if Defendants ultimately fail to prove actual damages on their breach of fiduciary duty Counterclaim . . , the absence of such evidence alone would not defeat their claim.").

89.     For each of these reasons, the Court concludes that the Motions for Summary Judgment filed by each side as to the Bronsons' claim for breach of fiduciary duty brought derivatively on behalf of the Pub should be **DENIED**.

**B.     Constructive Fraud**

90.     Our Supreme Court has recognized that the elements of a constructive fraud claim largely overlap with the elements of a claim for breach of fiduciary duty. *See Chisum*, 376 N.C. at 706–07.  The elements for constructive fraud are: "(1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." *White v. Consol. Planning Inc.*, 166 N.C. App. 283, 294 (2004) (cleaned up). "The primary difference between pleading a claim for constructive fraud and one for

breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself." *Id.*

91.     In addition to the arguments discussed above with respect to the Bronsons' derivative claim for breach of fiduciary duty, Burnham also argues that he is entitled to summary judgment on the Bronsons' derivative claim for constructive fraud because the Bronsons have failed to establish that Burnham actually conferred any benefit upon himself.

92.     However, after thoroughly reviewing all of the evidence of record, the Court finds that there is a genuine issue of material fact on this issue.

93.     Although Burnham contends that he never acted to benefit himself at the expense of the Pub, the Bronsons' evidence that Burnham engaged in self-dealing—if ultimately accepted by the jury at trial—reflects various ways in which Burnham could have received a personal benefit.  North Carolina law is clear that "[w]here a fiduciary relationship exists between the parties, the presumption of fraud arises where the superior party obtains a *possible* benefit."  *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 32 (2003) (cleaned up and emphasis added); *see Collier*, 216 N.C. App. at 432 (noting that for a claim of constructive fraud to survive summary judgment, a plaintiff need only present evidence that the defendant "received a *possible* benefit" from the challenged conduct); *RCJJ, LLC v. RCWIL Enters., LLC*, 2016 NCBC LEXIS 46, at *34 (N.C. Super. Ct. June 20, 2016) (denying summary judgment on a constructive fraud claim where there was evidence that the

defendant "*may* have personally benefited" from his alleged misconduct (emphasis added)).

94. Burnham's mere conclusory assertions that the transactions at issue were fair to the Pub are simply not enough to entitle him to summary judgment on this claim. *See Bogovich v. Embassy Club of Sedgefield, Inc.*, 211 N.C. App. 1, 10–11 (2011) (holding that the defendants' testimony that they "had a valid reason for executing and recording the challenged [transactions]" and believed that such transactions were necessary was insufficient to entitle them to summary judgment); *Schwartzback v. Apple Baking Co.*, 109 N.C. App. 216, 221 (1993) (holding that a director's "opinion" as to the fairness of the transaction "[was] meaningless" and "failed to carry his burden of showing the subject transaction [was] just and reasonable to [the company]"); *Brady*, 2015 NCBC LEXIS 5, at *28 (denying summary judgment because there was a question of fact as to "what happened to" certain money that was "transferred by [defendant] out of the corporate bank account" and "whether [it] was spent on behalf of the corporation[ ] or was used for improper purposes").

95. Accordingly, because the Court finds that there are genuine issues of material fact relating to the Bronsons' derivative claim on behalf of the Pub for constructive fraud, the cross-Motions for Summary Judgment as to this claim are **DENIED**.

C. **Judicial Dissolution**

96. Pursuant to N.C.G.S. § 57D-6-02, the Court may dissolve a limited liability company upon the application of a member when "it is established that (i) it

is not practicable to conduct the LLC's business in conformance with . . . this Chapter or (ii) liquidation of the LLC is necessary to protect the rights and interests of the member[s]." N.C.G.S. § 57D-6-02(2).

97. Although the Amended Complaint seeks dissolution of the Pub, that claim has largely been rendered moot as a result of its administrative dissolution by the North Carolina Secretary of State.[5]

98. Because the Pub is no longer conducting business, all that remains is the "winding up" process, which will essentially consist of marshaling the Pub's assets and paying its liabilities in accordance with N.C.G.S. § 57D-6-08.

99. In their briefing with regard to the present Motions, the parties dispute whether the Court should order the appointment of a receiver to supervise the winding up of the Pub's affairs. *See* N.C.G.S. § 57D-6-07(c) (permitting the Court to "appoint a receiver under N.C.G.S. § 57D-6-04 to wind up the LLC").

100. However, the Court deems it appropriate to defer ruling on whether to appoint a receiver until after a final judgment is entered on the Bronsons' derivative claims for the following reasons.

101. First, as noted earlier, there appears to be a genuine dispute of material fact as to the Bronsons' and Burnham's respective ownership interests in the Pub, the resolution of which will be necessary in order to determine the parties' proper

---

[5] Although the Bronsons sought to hold Burnham in contempt for the unilateral filing of articles of dissolution by his employee, they have since represented to the Court that they do not seek an order from the Court effectuating the restoration of the Pub's status as an active business in North Carolina.

shares of the Pub's net assets. The Bronsons have alleged—and produced evidence indicating—that as the result of participating in various calls for capital contributions and purchasing other members' interests, they now collectively hold a 54.07% interest in the Pub, with Burnham owning the remaining 45.93%. (ECF No. 49.5, at 2; *see also* Paul Bronson Dep. Tr., at 60–63.) Yet Burnham contends—and has produced evidence suggesting—that he actually owns 51.84% of the Pub, with the remaining ownership percentages as follows: 17.505% owned by Paul Bronson; 17.505% owned by John Bronson; 3.15% owned by Kenyon Burnham; and 10% owned by Carol Fielitz. (ECF No. 43.12, at 4; ECF No. 43.14, at 5; *see generally* ECF No. 49.14 [sealed].)

102. Second, even if the parties' ownership interests were not in dispute, it would still be premature for the Pub's assets to be distributed because it is presently unknown whether Burnham will ultimately be required to pay damages to the Pub once the trial of this case has concluded.

103. Accordingly, the Court **DEFERS** ruling on the parties' cross-Motions for Summary Judgment with respect to this claim.

## II. Claims Relating to Executive Suites

104. With respect to Executive Suites, both the Bronsons and Burnham have sought summary judgment in their favor with respect to the Bronsons' (1) derivative claim for breach of fiduciary duty; (2) derivative claim for constructive fraud; and (3) claim for judicial dissolution.

105.   For the following reasons, the Court once again concludes that the entry of summary judgment is not appropriate as to any of these claims.

**A.      Breach of Fiduciary Duty**

106.   In support of the Bronsons' claim for breach of fiduciary duty asserted derivatively on behalf of Executive Suites, the Bronsons contend that Burnham has engaged in repeated financial misconduct, including using the company's funds for his own personal use and to pay for his other business ventures.

107.   In support of this claim, the Bronsons have offered evidence of various entries from Executive Suites' general ledger reflecting payments Burnham caused Executive Suites to make to various entities under Burnham's ownership and control. These include payments to: (1) KDM Acquisitions LLC; (2) KDM Development Corp.; (3) Foxwood Apartments LLC; (4) Foxwood Apartments Management, LLC; and (5) Burnham directly.  (*See, e.g.,* ECF Nos. 43.17, 49.4, at 1120 (reflecting five payments totaling $1,201.57 being made to KDM Acquisitions LLC under the "Travel" and "Meals" headings between 15 February 2017 and 31 May 2018); at 55 (reflecting three payments totaling $2,673.26 being made to KDM Development Corp. on 14 January 2021); at 656 (reflecting a payment of $935 to Foxwood Apartments LLC); at 2 (reflecting two payments totaling $2,465.76 being made to Foxwood Apartments Management, LLC); at 1025 (reflecting a payment of $20,000 to Burnham under the heading "Management Fees" on 15 August 2019)).

108.   In addition, the Bronsons have introduced evidence of certain payment entries that do not appear on their face to be related to Executive Suites' business

and for which Burnham has failed to provide any explanation. These include payments made to: (1) Life Time Fitness, Inc.; (2) City Club of Raleigh; (3) Destination Travel Network; and (4) Live More Travel. (*See, e.g.,* ECF Nos. 43.17, 49.4, at 1022–25 (reflecting payments totaling $178,219.92 to Life Time Fitness, Inc. between 9 January 2017 and 15 May 2025); at 1023 (reflecting payments totaling $705.96 to City Club of Raleigh); at 1013–14 (reflecting payments totaling $3,900 to Destination Travel Network between 6 February 2018 and 16 April 2019); at 610 (reflecting a $50 payment to Live More Travel on 22 March 2018)).

109. Furthermore, although Burnham once again seeks to avail himself of the business judgment rule, his arguments fail for the same reasons set out above in connection with his invocation of the rule in defense of the Bronsons' claims on behalf of the Pub.

110. Based on the totality of the record evidence, the Court concludes that there is a genuine issue of material fact as to whether Burnham breached his fiduciary duties to Executive Suites and whether Executive Suites was harmed as a result. *See State ex rel. Long v. ILA Corp.*, 132 N.C. App. 587, 597 (1999) (holding that evidence of the defendant causing the company to spend $77,000 "to repay a debt to a company controlled by defendant" was sufficient to find a breach of fiduciary duty); *Compass Tax Servs. LLC v. Karki*, 2024 NCBC LEXIS 73, at *22–23 (N.C. Super. Ct. May 20, 2024) (finding a "genuine dispute of material fact . . . as to whether [defendant] breached a fiduciary duty to [the company] by paying himself a management fee, and whether the amounts paid were disproportionate to the value

of the services" received by the company); *Morgan v. Turn-Pro Maint. Servs., LLC*, 2020 NCBC LEXIS 5, at \*21 (N.C. Super. Ct. Jan. 15, 2020) (concluding that the manager of a limited liability company breached its fiduciary duties to the company by "using [the company's] funds for personal use" and "transferring money from [the company's] bank account" to the manager's separately owned business).

111. Accordingly, the Court concludes that the cross-Motions for Summary Judgment should each be **DENIED** as to this claim.

## B.    Constructive Fraud

112. With respect to the Bronsons' derivative claim for constructive fraud on behalf of Executive Suites, there likewise exists a genuine issue of material fact that precludes the entry of summary judgment. *See Compass Tax Servs. LLC*, 2024 NCBC LEXIS 73, at \*23 (denying summary judgment as to a constructive fraud claim where the defendant failed to "offer[ ] sufficient evidence to show that" the management fees he and his company received "were proportionate with the value of th[e] services" received by the plaintiff); *Albritton v. Albritton*, 2021 NCBC LEXIS 53, at \*25 (N.C. Super. Ct. June 7, 2021) (concluding that summary judgment on a constructive fraud claim was inappropriate where the defendant "could not provide any explanation as to how the [c]hallenged [t]ransactions served the business interests of" the company).

113. Accordingly, the parties' cross-Motions for Summary Judgment with respect to this claim are **DENIED**.

## C.     Judicial Dissolution

114.    The parties disagree as to whether grounds exist for the judicial dissolution of Executive Suites.

115.    Our Supreme Court has recently articulated the relevant factors that a trial court should consider in assessing a request for dissolution:

> (1) whether the management of the company is unable or unwilling to work together to reasonably engage in or promote the purpose for which the company was formed; (2) whether there is a deadlock between the managers; (3) whether the operating agreement provides a means of navigating around such deadlock; (4) whether, due to the company's financial position, there is still a business to operate; (5) whether continuing the company is financially feasible; and (6) whether a member or manager has engaged in misconduct.

*James H.Q. Davis Tr. v. JHD Props., LLC*, 387 N.C. 19, 29 (2025) (footnote omitted).

116.    In support of the argument that judicial dissolution is necessary, the Bronsons contend that Burnham has repeatedly refused to honor their managerial rights and has gone so far as to physically lock them out of the company's offices.  The Bronsons further assert that dissolution is necessary to protect their rights in light of Burnham's alleged pattern of self-dealing and financial mismanagement as discussed above.

117.    In response, Burnham represents that—unlike the Pub—Executive Suites is still actively engaged in business operations and that the Bronsons have failed to show that the continued operation of the business is no longer practicable.  Moreover, he argues that the Bronsons have been unable to put forth sufficient evidence demonstrating that dissolution is necessary to protect their interests.

118. Here, because the parties' competing arguments are inextricably intertwined with many of the same issues as to which the Court has concluded that genuine disputes of material fact exist, the Court deems it appropriate to defer a ruling on the Bronsons' request for judicial dissolution until after trial. *See Clark v. Burnette*, 2021 NCBC LEXIS 45, at *42–43 (N.C. Super. Ct. Apr. 29, 2021) (denying summary judgment on a judicial dissolution claim where "the question as to whether [defendant] breached the [o]perating [a]greement remain[ed] for determination by a jury").

119. Accordingly, the Court **DEFERS** ruling on the parties' cross-Motions for Summary Judgment on the Bronsons' dissolution claim as to Executive Suites.

## CONCLUSION

Therefore, it is **ORDERED** as follows:

1. Plaintiffs' Motion for Summary Judgment as to their derivative claims on behalf of both the Pub and Executive Suites for breach of fiduciary duty and constructive fraud is **DENIED**.

2. Defendant's Motion for Summary Judgment as to Plaintiffs' derivative claims on behalf of both the Pub and Executive Suites for breach of fiduciary duty and constructive fraud is **DENIED**.

3. The Court **DEFERS** ruling on Plaintiffs' claims for judicial dissolution as to both the Pub and Executive Suites.

**SO ORDERED**, this the 29th day of April 2026.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases